IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DANA HAMRICK,

        Plaintiff,

v.

                                    Civil Action No. 3:08CV92
                                        (Judge Maxwell)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Dana Hamrick ("Plaintiff") filed applications for DIB and SSI on March 3, 2004 (February 29, 2004 protective filing date), alleging disability beginning November 12, 2003, due to pain, stiffness, soreness, weakness, headache, numbness, burning, and tingling of his head, neck shoulders, back, hips, legs, and arms (R. 95). The applications were denied at the initial and reconsideration levels (R. 53, 54, 317, 322, ). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") David Wurzel held on August 17, 2005 (R. 327). Plaintiff, represented by counsel, testified on his own behalf. Alan Cummings, a Vocational Expert ("VE"), also testified. On February 22, 2006, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from his alleged onset date of November 12, 2003, through the date

of the decision (R. 51-52). On June 21, 2007, the Appeals Council denied Plaintiff's request for review (R. 5), rendering the ALJ's decision the final decision of the Commissioner.

On June 27, 2007, Plaintiff's counsel advised Plaintiff that he should file an appeal with this Court, but that counsel was not admitted to practice in the Northern District of West Virginia (R. 12).[1] Counsel therefore advised Plaintiff to find an attorney licensed to practice in this District, and to file a Complaint in this District on or before August 21, 2007. On August 24, 2007, Plaintiff appointed VanNostrand and Morton to be his counsel for this claim (R. 11). Ms. Van Nostrand wrote a letter to the Appeals Council that same date, requesting an extension to file a civil action; a copy of the claim file; and a copy of the hearing CD or tape (R. 8). Ms. VanNostrand further moved the Appeals Council to re-open its decision "on the basis of new and material evidence" (R. 9). On August 10, 2007, the Appeals Council sent a Notice to counsel granting the extension of time. Apparently, on October 26, 2007, the Appeals Council provided the requested duplicates and recording of the hearing, but "that letter also inappropriately included language that referred to the Council not taking any further action for a period of 45 days" (R. 20). The Appeals Council, however, had denied the request for review more than a year earlier, and therefore stated that "any administrative action the Council could take ended with it's [sic] denial of the request for review." The Council stated it therefore could not consider the newly submitted evidence, but "did consider whether any of the new evidence might establish a basis to reopen the prior actions, but [] decided that it does not." Finally, the Council advised that because of the "potentially confusing language included in the October 26, 2007 letter, the Council concludes that another extension of time to file a civil action in this case should be granted . . . ."

-------------------------

[1]Plaintiff moved from Ohio to West Virginia during the time between the Request for Review and the Appeals Council decision (R. 16).

2

Plaintiff, through new counsel, filed the Complaint in this Court on May 21, 2008 [Docket Entry 1].

## II. Statement of Facts

Dana Hamrick ("Plaintiff") was born on June 7, 1961, and was 44 years old on the date of the ALJ's Decision (R. 52, 330). He finished the 10th grade in high school and has his GED as well as formal training as a commercial truck driver (R. 330) and has past work as a fast food worker, over-the-road truck driver, and factory worker (R. 334-338). He worked at the factory for approximately ten years (R. 100). He stopped working there in November 2003 (his alleged onset date), because he "couldn't do it no more" (R. 338), explaining that his termination was a "mutual agreement" because he could not do the "required constant heavy lifting, twisting, bending, long hours of standing."

Plaintiff was treated by his primary care provider, Dr. Martin Loftus, from at least March 17, 1995, through February 2003 (R. 148-155).[2] It was noted during the first record of an office visit with Dr. Loftus that Plaintiff had scoliosis and was a smoker. He was treated for various complaints including ear infections, cough, respiratory infections, and headaches.

On May 6, 1998, Plaintiff told Dr. Loftus he felt good, but had questions regarding arthritis (R. 153). It was noted he had scoliosis with one leg 3/4" shorter than the other. He had also suffered a fractured vertebrae in his neck as a child. He was diagnosed with scoliosis, asthma, and leukocytosis.[3]

---

[2]The undersigned includes office visits with Dr. Loftus prior to Plaintiff's alleged onset date, insofar as they are relevant to the issues in this case.

[3]A transient increase in the number of leukocytes in the blood; seen normally with strenuous exercise and pathologically accompanying hemorrhage, fever, infection, or inflammation. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1043 (31st ed.)

On July 26, 2000, Plaintiff followed up with Dr. Loftus for a trip to the ER, for sharp pains in the back of his head for two days (R. 151). He was diagnosed with headache, eustachion tube dysfunction, and as a smoker.

On December 12, 2000, Plaintiff presented to Dr. Loftus with sinus pressure and headache and scratchy throat for two days (R. 151). He was diagnosed with possible sinusitis.

On October 10, 2002, Plaintiff presented to Dr. Loftus with complaints of being weak and tired and chest pains and leg cramps for two months (R. 150). It was noted he had quit smoking four months earlier. He was diagnosed with leg cramps and atypical chest pain and scheduled for a chest x-ray and EKG.

On March 11, 2003, Plaintiff presented to Dr. Loftus with complaints of being tired with muscle aches for the past nine months (R. 149). It was noted he smelled strongly of cigarettes, although he denied smoking for nine months. He said his father lived with him and smoked in the house. Dr. Loftus diagnosed hypothyroid, fatigue, and weight gain.

On June 24, 2003, Plaintiff presented to Dr. Loftus with complaints of hip and lower back pain for 30 years (R. 150). Advil did not help. He was diagnosed with hypothyroid, low back pain, and scoliosis.

Five days later, Plaintiff presented to Dr. Loftus for a review of his blood work and follow up of his low back and hip pain (R. 149). Ibuprofen was no relief. He was diagnosed with hypothyroid, low back pain and scoliosis.

On August 4, 2003, Plaintiff underwent x-rays of the lumbar spine, which showed arthritic changes in the lumbar spine and marked scoliosis of the upper lumbar spine convexed left (R. 159).

On September 4, 2003, Plaintiff presented to Dr. Loftus for a review of his blood work, and hip pain (R. 148). Advil was not helping his pain. He was diagnosed with hypothyroid and scoliosis

with back pain.

On October 3, 2003, Plaintiff presented to Dr. Loftus with complaints of sinus pressure for one day (R. 148). He reported that Naprosyn was not helping his back pain (R. 148). He was diagnosed with hypothyroid, scoliosis and back pain, and allergy.

Plaintiff's alleged onset date is November 12, 2003, the date he states he was terminated from his job by "mutual agreement" because he could no longer do it.

On November 13, 2003, Plaintiff presented to Dr. Loftus with complaints of feeling "pretty rotten" (R. 148). He had "lost job" and was "leaving area." He was feeling better on his thyroid medication and his weight was better. He was diagnosed with hypothyroid and scoliosis.

On February 13, 2003, Plaintiff changed doctors from Dr. Loftus to Dr. Leroy LeFever, DO (R. 225). He complained of pain in his hips, back, and neck, and said naprosyn did not help. It was noted Plaintiff quit smoking 1 ½ years earlier. Examination showed decreased range of motion of the neck with tenderness of the spinous process and scoliosis; decreased range of motion of the thoraco-lumbar spine with tenderness; and decreased range of motion of the hips. Dr. LeFever's assessment was neck pain, scoliosis, arthritis of the hips, hypothyroid, and asthma. He prescribed a COX II inhibitor, physical therapy, Flexeril, Albuterol and Unithroid.

That same date, Plaintiff had x-rays of the cervical spine, which showed osteophytes at multiple levels; slight disc narrowing at C5-6; no abnormal movement with flexion or extension; neural foramens narrowed at C5-6; narrowing on both sides at C3-4; and narrowing on the right at C4-5 (R. 172). The impression was degenerative arthritis and disc disease. X-rays of the thoracic spine that same date showed moderate scoliosis. X-rays of the lumbosacral spine showed degenerative arthritis and disc disease plus scoliosis.

Plaintiff went to a physical therapy evaluation on February 24, 2004 (R. 164-170). His injury

was listed as fractured neck 32 years ago playing baseball. He complained currently of headaches two to three times per week, numbness and tingling in the legs, and constant back pain, among other symptoms. It was noted that x-rays showed arthritis of the hips. He complained of increased pain carrying more than a bag of groceries and a case of pop; that it was hard to put on socks; and that he had a hard time walking due to pain. He rated his pain as a 7 out of 10 at worst, and 2-3 out of 10 at best. It was noted that a precaution/contraindication to pain prescriptions was that he drank 5-6 beers per day.

Examination showed 4/5 strength at all levels, handgrips of 80 pounds right and 90 left; positive slump test on the right; positive piriformis;[4] positive Faber's; and negative straight leg raising. Plaintiff was unable to squat and recover and had trouble reaching his feet to put on socks. He had a positive Waddell's test. There was no sign of edema. His shoulders were rounded and he had marked scoliosis and decreased lumbar lordosis. His lumbosacral spine was tender to palpation, as were his upper trapezoids.

The physical therapist opined that Plaintiff's rehabilitation potential was fair and he should attend physical therapy two times a week for four to five weeks.

Plaintiff began rehabilitation services and physical therapy at United Disability Services on February 17, 2004 (R. 207).

It was noted on February 24, that Plaintiff did not take pain medications (R. 202). He was

---

[4]Rare neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve . . . . causing pain frequently described as tingling or numbness in the buttocks and along the nerve, often down to the leg. The pain may worsen as a result of sitting for a long period to time, climbing stairs, walking or running. Generally treatment begins with stretching exercises and massage. Anti-inflammatory drugs may be prescribed. Cessation of running, bicycling or similar activities may be advised. Corticosteroid inject may provide temporary relief. In some instances, surgery is recommended. The prognosis is good. Once symptoms are addressed, individuals can usually resume their normal activities. National Institute of Neurological Disorders and Stroke, National Institute of Health. http:// ninds.nih.gov/disroders/piriformis_syndrome.htm.

going to call the clinic to get medications. He said if he got up more often (at 10 minute intervals) the pain was more manageable. He was to see if he could get an appointment at the pain management center.

On February 27, 2004, a community based work assessment was performed, which found Plaintiff's attendance acceptable and his progress at an expected level (R. 206). Comments included that Plaintiff completed his 9-day assessment; he had to take extra breaks due to pain in his legs and hips; arrived usually on time; did not take a lunch break because he took extra breaks during work shift; and showed initiative to start his own work day. The job tasks involved only sitting, bending, lifting 0-12 pounds, and grasping and twisting. It was noted that even with pain, Plaintiff "managed to get the job done" and all his goals were met at 100%.

A performance evaluation noted that Plaintiff always arrived and left on time, but that it took him 20 minutes to walk from the parking lot to his work station. He maintained good attendance and always took meals and other breaks appropriately "for his situation," which was described as "as needed for relief of pain." He maintained a good appearance; usually initiated work on his own; his work always compared favorably with his co-workers; and he communicated effectively. He usually attended to work consistently, despite having to leave for frequent walks every 20-30 minutes to relieve pain. His overall job proficiency was determined to be "average."

Plaintiff filed his applications for disability benefits on March 3, 2004.

On March 4, 2004, Plaintiff reported to his physical therapist that he had pain in his back and legs and a headache (R. 180). He also reported swelling in his arms and legs, although the therapist reported there was no visible sign of edema.

On March 5, 2004, Plaintiff presented to Dr. M. Edwards D.O. (at Dr. LeFever's office) for complaints of pain in his back, neck and hips (R. 224). He was attending physical therapy, and said

7

his pain was slightly improved. He also complained of a "swelling sensation" in his legs. Examination showed scoliosis of the spine with diffuse pain on palpation; no edema of the upper or lower extremities; and intact sensation. He was diagnosed with degenerative joint disease, degenerative disc disease, history of asthma, and hypothyroidism. Flexeril was discontinued and he was prescribed Darvocet. He was to continue physical therapy.

On March 12, 2004, Plaintiff reported to his physical therapist that he had pain all over, and had to take two pain pills (Darvocet) (R. 178).

On March 16, Plaintiff reported increased pain in his neck on the left side, at a level of 7/10, and back and leg pain at a level of 5/10. He reported that he had been using more pain medications (Darvocet) (R. 178). Palpation of the neck did not demonstrate tightness.

On March 19, 2004, Plaintiff reported to his physical therapist that he had increased pain and headache at a level of 7/10 (R. 176).

That same date, Plaintiff presented to Dr. LeFever "still having back pain and pain down back of leg," along with neck pain and hip pain that were better with physical therapy. Examination showed paravertebral tenderness of the thoracic and lumbosacral spine. Plaintiff was diagnosed with low back pain and osteoarthritis.

On March 26, 2004, Plaintiff reported to his physical therapist that he had back, neck, and leg pain at a level of 6/10 (R. 174). He could, however, walk more easily. He was to continue his plan of treatment but was discharged from physical therapy.

On April 29, 2004, Plaintiff presented to Dr. LeFever with complaints of sinus congestion and pressure for five days, improved on Actifed (R. 222). Exam showed scoliosis and paravertebral tenderness of the back. He was diagnosed with sinusitis.

On June 1, 2004, Plaintiff underwent a consultative examination at the request of the State

agency, performed by Jeffrey Welko, M.D. (R. 212). Plaintiff reported severe scoliosis since birth, with multiple spinal related complaints-- most notably a year's worth of progressively worsening neck pain with headaches. Plaintiff described the pain as precipitated by anything, particularly activity. Occasionally the pain radiated to his shoulders and mid upper arms. He also related a feeling of hand swelling and tenderness, although they never actually looked swollen. He also described multiple joint complaints including painful, weak, swollen knees, particularly with accentuated activity, and previous hip pains bilaterally "which are improved to the point where he no longer needs an ambulatory assist device (cane)."

Plaintiff said he had low back pain when on his feet for more than five minutes. He was not able to perform standing activities or activities of daily living including food preparation or clean up and had to change position constantly to alleviate low back pain discomfort. He took Bextra and Darvocet every four hours, but said they did not help.

Dr. Welko noted Plaintiff had a past medical history of hypothyroidism, on replacement therapy.

Upon examination, Plaintiff's upper and lower extremities had generally normal range of motion with no signs of synovitis. There was 1-2+ clubbing in the fingers. DTR's showed much diminished responses and relaxation phase, despite Plaintiff's claim of compliance with his thyroid medication.

Dr. Welko noted "good" motor findings and normal grasp, manipulation, pinch, and fine coordination. He also noted "limited effort even [with] coaxing" (R. 215). There was no muscle atrophy, spasm, spasticity or clonus. Plaintiff's shoulder, elbow, wrist and hand ranges of motion were normal, as were his hip, knee, and ankle ranges of motion. Plaintiff's cervical spine range of motion was limited in all areas, however, as was his dorsolumbar spine range of motion.

Dr. Welko's impression was that Plaintiff had a severe degree of scoliosis with chronic degenerative disc disease. He opined Plaintiff also possibly had cervical and/or lumbosacral disc disease and degeneration, although the absence of sciatica, the negative straight leg raise, and the normal hip range of motion made a diagnosis of lumbar disc disease less likely. Dr. Welko opined that Plaintiff should be restricted, pending further orthopedic evaluation, to carrying 10 pounds occasionally. He should have no standing in excess of two hours in an eight-hour workday, or for more than a few minutes at a time, and must be allowed to alternate standing and sitting frequently. Pushing and pulling with both upper and lower extremities were also limited. Plaintiff should be restricted from climbing, crouching, kneeling, crawling or stooping, and should have limited looking up or overhead tasks. Fine motor including manipulation, fingering, feeling and handling were relatively unimpaired, and he would have no particular environmental limitations.

On June 3, 2004, Plaintiff presented to Dr. LeFever with complaints of sore throat and ear itching and productive cough. He also reported that the Darvocet did not help his arthritis pain (R. 221). He was diagnosed with bronchitis.

On June 18, 2004, Plaintiff presented to Dr. LeFever for a routine physical, stating he was "using Darvocet very regularly" (R. 220). It was noted Plaintiff had quit smoking two years earlier, but used alcohol two to three times a day. Examination showed scoliosis of the back but no tenderness, and no edema of the extremities. The assessment was scoliosis, degenerative disc disease, degenerative joint disease, asthma, hypothyroid, and fatigue. Plaintiff was referred to pain management and for blood work.

On July 5, 2004, State agency reviewing physician Teresita Cruz, M.D completed a physical Residual Functional Capacity Assessment ("RFC"), opining Plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; could stand/walk about 6 hours in an 8-hour

workday; could sit about 6 hours in an 8-hour workday; and could push/pull to the limits of lifting and carrying (R. 235). He could frequently stoop and occasionally climb and crawl, but had no other postural limitations. He was limited in reaching in all directions including overhead. He had no visual or communicative limitations, but should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation (R. 237). Dr. Cruz stated that he did not agree with the functional limitations found by Dr. Welko, the State consultative examining physician, because Plaintiff had normal hip ROM and no muscle spasm or spasticity, and Plaintiff admitted he no longer needed a cane.

On July 15, 2004, Plaintiff presented to rheumatologist James Goske, M.D., upon referral from Dr. LeFever (R. 243). Plaintiff was taking Bextra, Darvocet, and Unithroid. He had tried naprosyn with no relief. He complained of pain, stiffness, and soreness, and a feeling of being swollen. He had had physical therapy. He was diagnosed with scoliosis and "bone spurs of disc." Plaintiff said his neck and upper and low back were bad, but his hips were ok since he started taking Bextra.

Upon examination, Plaintiff could only flex to his knees when trying to touch his toes. Dr. Goske noted up to 8 trigger points out of 18. [5] Dr. Goske diagnosed asthma, neck and back pain, and fibromyalgia.

On July 26, 2004, plaintiff presented to Dr. LeFever for discussion of his lab work and a refill of Darvocet (R. 254).

Plaintiff presented to Dr. Goske for follow up on August 5, 2004, saying there was no change since his last visit and he still felt "pretty bad." He used Albuterol frequently. Dr. Goske diagnosed scoliosis, degenerative disc disease of the cervical and lumbosacral spine, fibromyalgia, and asthma.

[5]The ALJ correctly noted that Dr. Goske had listed only four trigger points, but Dr. Goske did not state whether each of the four trigger points were found bilaterally, and there was no space on the form for such a finding.

On August 26, 2004, Plaintiff presented to Dr. LeFever for his lab results (R. 255). He was diagnosed with hypothyroid and degenerative arthritis.

. On August 31, 2004, State agency reviewing physician Horton, M.D. affirmed Dr. Cruz's assessment.

On October 4, 2004, Dr. LeFever noted that Plaintiff had presented to a psychiatric hospital for depression due to pain and inability to work and enjoy life. He diagnosed Plaintiff with depression, degenerative joint disease, osteoarthritis, and fibromyalgia (R. 253).

On November 8, 2004, Plaintiff said his depression was improved (R. 252). He said he had had complaints of pain all his life but had "never done anything about it." He admitted to taking Darvocet every 4-6 hours, even though instructed to take one only every 6 hours.

On November 24, 2004, Plaintiff presented to Dr. LeFever for his chronic back pain (R. 251). The doctor noted that Plaintiff quit smoking two years earlier, but then also noted the strong odor of tobacco on Plaintiff. He also noted that Plaintiff drank 4 beers a day. He observed that Plaintiff moved slowly. He diagnosed low back pain, history of osteoarthritis, and scoliosis.

Plaintiff presented to Dr. LeFever's office on January 18, 2005, for complaints of pain not well-controlled with Darvocet (R. 249). He was awaiting referral for pain management. His Social History noted he drank "a couple of beers" almost daily. Examination showed moderate scoliosis with tissue texture changes. The assessment was back pain due to scoliosis, arthritis and disc disease; hypothyroid; and depression. There was a note stating that Plaintiff was counseled/educated regarding substance abuse, and was told to stop using alcohol. There is, however, no diagnosis of alcohol or substance abuse. His Darvocet was discontinued, but he was prescribed Flexeril and Vicodin.

On February 1, 2005, Plaintiff presented to Dr. LeFever's office , stating that Vicodin was

helping (R. 248). Upon examination Plaintiff had slightly diminished breath sounds and scoliosis. He was diagnosed with hypercholesterolemia, multi-factored back pain, depression, and hypothyroid.

On March 1, 2005, Plaintiff presented to psychologist Vera Buk-Bjerre for an admission assessment (R. 259). Plaintiff reported that he was depressed and had low energy. He reported he was under a lot of stress, due to having recently gone bankrupt and losing his house. His father, uncle, and an aunt all died around Christmas, and he had been very close to his dad. He also had four children at home and was unable to work due to his variety of chronic illnesses.

Plaintiff reported he used alcohol daily, drinking 6-7 beers most days "but does not see this as a problem." He quit smoking three years earlier. He was prescribed Darvocet and muscle relaxants but did not often take them "because they didn't help." Dr. Buk-Bjerre found Plaintiff had symptoms of depression including depressed mood, disturbed sleep, trouble concentrating, and fatigue, despite taking Remeron. He also worried a great deal and had anxiety, which interfered with completing activities, such as buying a used car. He said he had felt depressed for more than 1 ½ years. He was unable to work, resulting in losing the house, moving to public housing, and going bankrupt. Since December, his father and an aunt and uncle had all died.

Mental Status Examination showed Plaintiff related appropriately and had no unusual mannerisms or gestures, but was disheveled and unkempt. He had depressed mood but full range of affect appropriate to theme. His intellectual functioning appeared average, and he had good social awareness, adequate self-care abilities, and intact memory. He had logical and organized thinking and accurate and appropriate perceptions. His speech was coherent and appropriate and his judgment and insight were within normal limits. He denied suicidal or homicidal ideation.

Dr. Buk-Bjerre diagnosed major depression single/moderate and generalized anxiety disorder that may be due to medical condition. She assessed his global assessment of functioning (GAF) as

50.[6]

On March 16, 2005, plaintiff followed up with Dr. Buk-Bjerre regarding his depression (R. 276). They discussed the loss of his dad and other relatives. Plaintiff was dealing with the estate. They also discussed his health and financial concerns. Plaintiff's wife was trying to get a two year degree and their welfare benefits may be cut off before she finished, which was very frustrating for him. Plaintiff also expressed frustration with the Medical Doctor in charge of the practice where he was a patient. He saw a doctor there who gave him meds that helped, but the MD in charge would not let Plaintiff get these meds. He was therefore in constant pain and felt confused and frustrated and was considering switching to another practice.

On April 11, 2005, Plaintiff saw Dr. Buk-Bjerre for follow up of his depression (R. 275). He reported he cried about his Dad for several hours one day and a half hour another day. The doctor told him this was a normal part of grieving. Plaintiff was looking forward to going to the pain clinic because they were taking Bextra off the market, which had "been working well" for his hip pain.

On April 18, 2005, Plaintiff presented to the emergency room for acute exacerbation of lower back pain (R. 312). He was given Demerol and Phenergan and discharged with a prescription for Celebrex.

On April 19, 2005, Plaintiff saw Dr. Buk-Bjerre for follow up of his depression (R. 274). Plaintiff reported he was in so much pain the night before he went to the hospital. They gave him a shot of painkiller but it did not help. He would be going to the pain clinic the end of the month. It was reported that Plaintiff tried visualization "but finds it hokey. Relaxation only works while

---

[6]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

he's doing it. Same goes for a hot shower. Nothing really helps. He's feeling discouraged."

> On April 4, 2005, Dr. Buk-Bjerre summarized Plaintiff's mental conditions as follows: Dana is beginning to deal with loss and grief issues. He is also expressing his sadness about his physical condition. He is attempting to get disability and that is a frustrating process for him.

(R. 273).

On April 21, 2005, Plaintiff presented to the emergency room with complaints of chest pain (R. 299). A chest x-ray on April 21, 2005, indicated bronchitis with possible left lower lobe infiltrate (R. 288). Plaintiff was diagnosed with pneumonia and non-cardiac chest pain (R. 293).

Plaintiff was finally seen at the pain management clinic on April 21, 2005

On May 3, 2005, Plaintiff saw Dr. Buk-Bjerre regarding his depression (R. 271). Plaintiff was feeling discouraged because his pain medication was not helping much. Also, "[w]ith four children at home and Dana not able to do very much, it's stressful."

On May 11, 2005, Plaintiff followed up with Dr. Buk-Bjerre regarding his depression (R. 270). Plaintiff reported having had a "tough week." His pain meds made him constipated, resulting in a lot of pain before it was resolved. He was also upset that "some African American" kids told his kids that "their kind" wasn't welcome in the public housing playground where they lived. He believed he'd feel better when he got the situation with his father's estate[7] and his pain pills causing constipation resolved.

On May 17, 2005, Plaintiff presented to Dr. Buk-Bjerre for follow up of his depression (R. 269). Plaintiff complained that his children were "picked on again" at the playground near their home. The doctor suggested an adult supervise the kids while they were there until the other kids got used to them. The doctor noted Plaintiff was very stressed out with pain, applying for Social

---

[7]According to later-submitted records, Plaintiff's father had left him property in West Virginia, where Plaintiff and his family would be able to put a trailer and live.

Security, and with family issues. He could not longer cook because it hurt his back too much. He also could not do yard work, and since they had only one car, was often "stuck in the house." He could not walk very far without a lot of pain.

On May 24, 2005, Plaintiff presented to Dr. Buk-Bjerre for follow up of his depression (R. 268). He was upset again because "some kids took a basketball from his kid." He called the police who said there was no way of knowing whose basketball it really was and that they would get Plaintiff's son another basketball with his name on it. The police again suggested that Plaintiff not let his children play at the park unsupervised. Plaintiff then got a note from his landlord complaining that his children were making too much noise. He "figures it's in retaliation for getting the police involved." Plaintiff was "fed up" and wanted to move out, but his wife wanted to finish her education first. She was taking a two-year course to become a Probation Officer. The psychologist reported: "He's dying to go to W. Va. and brightened up quite a bit while telling me what it's like there."

On May 31, 2005, Plaintiff presented to Dr. Buk-Bjerre for follow- up of his depression (R. 267). He was making partial progress. He was in a good mood because he had spent the weekend in West Virginia "enjoying the outdoors and relaxing." The doctor encouraged him to explore area parks where he now lived in Ohio. Plaintiff said he really missed West Virginia and hated where he lived and agreed it might help to get into the woods more often. He continued to settle his father's estate in West Virginia.

On June 14, 2005, Plaintiff presented to Dr. Buk- Bjerre for follow up of his depression (R. 265). He appeared to be in a lot of pain (he stated his pain was at a level of 7 out of 10).

On July 10, 2005, Plaintiff had an MRI of the lumbosacral spine, which showed levoscoliosis with multilevel degenerative disc disease and circumferential disc and osteophytic bulging with

associated distortion of the thecal sac at T12-L1, L1-2, L2-3, L3-4, and L4-5. There was no "significant" spinal stenosis. There was disc encroachment into and narrowing of the right L2 neural foramen (R. 278).

On August 16, 2005, Robert Geiger, M.D. wrote a letter to Plaintiff's counsel, noting he had just received the results of the July 10, 2005, MRI (R. 289). He opined the MRI revealed scoliosis and multi-level disc degeneration and arthritis, but no specific encroachment on the spinal canal "of any great concern." The doctor opined: "What this means is that he is destined to have continuing low back pain, which is most likely nonoperative because of the lack of spinal stenosis and the lack of any specific neurologic symptoms. Simply stated, you cannot operate on arthritis of the spine at many levels unless you are going to fuse the entire lower spine, which is simply not done."

Dr. Geiger continued that Plaintiff's treatment would consist of medication to control pain, and perhaps some spinal injections, trigger point injections, and physical therapy. He would also consider a TENS unit.

**Evidence Submitted to Appeals Council Subsequent to Appeals Council Decision**

After the Appeals Council rejected Plaintiff's Request for Review of the ALJ's decision, Plaintiff, through new counsel, submitted additional evidence, requesting the Appeals Council remand the claim to the ALJ or reopen. The evidence was included in the record by the Appeals Council, and consists of the following:

On June 22, 2007, Dr. Gamaliel P. Batalia, M.D. of United Pain Management , wrote a letter to Dr. Richard Douglas reporting that he had examined Plaintiff for his neck and low back pain (R. 22). Dr. Batalia's examination revealed increased pain on range of motion of both the cervical and lumbar spine. He observed that Plaintiff walked with a wobbly gait. There was lumbar paraspinal muscle spasm, worse on the left, and levoscoliosis in the lumbar spine. Studies of the cervical spine

17

showed severe degenerative changes with degenerative disc disease with a reversal of the normal curve. There was spinal canal stenosis at C5-C6. There was cord flattening and impingement with neural foraminal encroachment at C3-C4 and C4-C5 on the left. There was a tiny central disc herniation centrally at C4-C5, and a small focal herniation at C6-C7. There was a vertebral body hemangioma at C6. MRI of the lumbar spine showed levoscoliosis with multilevel degenerative disc disease. There was circumferential disc and osteophyte bulging with associated distortion of the thecal sac at T12-L1, and L1 through l%. There was disc encroachment and narrowing of the right neural foramen.

On July 19, 2007, plaintiff underwent a cervical epidural steroid injection for his diagnosis of cervical stenosis/radiculopathy (R. 30).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant was fully and currently insured for disability insurance benefits on his alleged onset date of November 12, 2003, and remained so insured at least through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since his alleged onset date of November 12, 2003.

3. The claimant has the following medically determinable impairments that in combination are considered "severe" under the Social Security Act and regulations: Degenerative disc and joint disease, cervical spine; degenerative disc and joint disease and scoliosis, lumbar spine; degenerative joint disease and scoliosis, thoracic spine; asthma; hypertension, hypothyroidism; major depressive disorder; generalized anxiety disorder; and alcohol abuse.

4. The claimant's medically determinable impairments, alone or in combination, do not meet or equal any listing in Appendix 1, Subpart P, Regulations No. 4 and No. 16.

5. With regard to the "B" criteria of the psychiatric review technique (20 C.F.R. 404.1520a(e)(2), 416.920a(e)(2)), both with and without drug addiction and

18

alcoholism (DA&A) included in the assessment, the claimant has mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has had one documented episode of decompensation of extended duration. The "C" criteria are not met.

6.  Subjective allegations about the claimant's impairments and about the effect of resulting functional limitations on ability to work are not fully credible for the reasons given in the body of the decision.

7.  The claimant retains the residual functional capacity to perform work activity at the sedentary exertional level, occasionally pushing, pulling, and reaching overhead with both upper extremities, with the following nonexertional limitations: Never climbing ladders, ropes or scaffolds except in an emergency; occasionally climbing ramps and stairs, occasionally balancing, stooping, crouching, kneeling and crawling; avoiding concentrated exposure to dangerous moving machinery, electric shock, radiation and unprotected heights; avoiding concentrated exposure to pulmonary irritants such as chemicals, dust, fumes, and gases; with the option to change positions from sitting to standing up to 10 times per hour; and mentally limited to unskilled work with no close or frequent interpersonal contact with the public.

8.  The claimant is unable to perform any past relevant work as an extruder operator . . . drum cleaner . . . tractor trailer driver . . . and restaurant manager . . . either as actually performed or as generally done in the national economy. This finding is supported by the testimony of a vocational expert.

9.  Born June 7, 1961, the claimant was 42 years old on his alleged onset date of November 12, 2003, and is 44 years old at the time of this decision; for purposes of evaluation under the medical-vocational guidelines, he is considered a "younger individual."

10. The claimant has a high school equivalence (GED) education and is literate and able to communicate in English.

11. The claimant has a skilled work background, but has no skills or semi-skills transferable to other work within the limitations of his residual functional capacity. This finding is supported by the testimony of a vocational expert.

12. Given the claimant's medical-vocational profile, if his residual functional capacity were for the full range of sedentary work, medical-vocational guideline 201.28 would direct a finding of "not disabled." Since, the claimant's residual functional capacity for sedentary work is reduced by nonexertional limitations, however, medical-vocational guideline 201.28 does not direct any disposition of this case, but must instead be used as a framework for decision.

13. Using medical-vocational guideline 201.28 as a framework for decision, I

find that there are jobs that the claimant is able to perform and sustain on a regular and continuing basis that exist in significant numbers in the national economy; for example Order clerk . . . with 1,000 jobs locally and 46,000 jobs nationally; inspector . . . with 1,000 jobs locally and 40,000 jobs nationally; and assembler . . . with 4,000 jobs locally and 161,000 jobs nationally. This finding is supported by the testimony of a vocational expert.

14. The claimant has not been under a "disability," as defined in the Social Security Act, at any time from his alleged onset date of November 12, 2003, through the date of this decision.

(R. 49-51).

# IV. Contentions

A. Plaintiff contends:

1. The ALJ erred in failing to find Plaintiff's multiple diagnoses of back impairments as individually "severe." The ALJ further erred by failing to consider Plaintiff's mental impairments (depression and anxiety), hypothyroidism, hypertension, asthma and fibromyalgia diagnoses as "severe."

2. The ALJ did not evaluate the claim under the pertinent listings, being 1.04 and 12.06, and provide a reasoned analytical discussion of the evidence as it related to the criteria of those listings as required by Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).

3. The substantial evidence of record supports a finding that Plaintiff's spinal impairments meet or equal Listing 1.04A.

4. Without any supporting professional medical opinion, the ALJ, on his own accord, diagnosed plaintiff as an alcoholic and drug addict. Gilliland v. Heckler, 786 F.2d 178 (3rd Cir. 1986); Dennis v. Heckler, 756 F.2d 971 (3rd Cir. 1985).

5. Even assuming, for sake of argument, Plaintiff suffers from alcoholism or is habituated to prescription drugs, the ALJ was required to follow the parameters set forth in SSR 82-60 if he felt drugs or alcoholism materially affected the issue of disability.

6. The ALJ did not follow the mandates set forth in SSR 96-7p when determining the weight and credit to be given to subjective symptoms.

7. The ALJ relied upon an incomplete and inadequate hypothetical question as a basis for his denial.

8. The ALJ ignored the favorable testimony of the VE in response to a question premised upon the findings of an independent evaluator, United Disability Services.

9. The Appeals Council erred by failing to reopen the claim at the review level for consideration of the new and material evidence in the form of the 2007

MRI showing significant and severe spinal impairments.

B.     The Commissioner contends:

    1.     Plaintiff's challenge that the ALJ should have found Plaintiff's impairments as individually severe is without merit.

    2.     Plaintiff's challenge that the ALJ erred in not finding that Plaintiff's condition met or equaled listing 1.04A is without record support.

    3.     Plaintiff cannot be entitled to benefits if alcoholism or drug addiction is material to the determination that he is disabled.

    4.     The ALJ properly considered plaintiff's subjective complaints.

    5.     The ALJ's hypothetical question included all of the impairments supported by the record.

    6.     Plaintiff's challenge to the Appeals Council's determination is improper.

## IV. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

1987).

## B. Severe Impairments

Plaintiff first argues that the ALJ erred in failing to find Plaintiff's multiple diagnoses of back impairments as individually "severe," and that he further erred by failing to consider Plaintiff's mental impairments (depression and anxiety), hypothyroidism, hypertension, asthma and fibromyalgia diagnoses as "severe." The ALJ found that Plaintiff had the following medically determinable impairments that were severe in combination: degenerative disc disease and degenerative joint disease of the cervical spine; degenerative disc and joint disease and scoliosis of the lumbar spine; degenerative joint disease and scoliosis of the thoracic spine; asthma; hypertension; hypothyroidism; major depressive disorder; generalized anxiety disorder; and alcohol abuse. The undersigned does not find it reversible error to make a finding that Plaintiff's individual impairments were severe in combination, and not individually, because, having found the impairments all medically determinable and severe in combination, the ALJ was required to consider each and every medically determinable impairment throughout his decision. 404.1523.

On the other hand, the ALJ did not find Plaintiff to have medically determinable fibromyalgia, because neither Dr. Goske nor any other doctor ever found the 11 trigger points required for a diagnosis of fibromyalgia. Further, the ALJ noted that clinical findings of trigger points in the record, if any, were extremely sparse. The ALJ found that Dr. Goske had found only four trigger points. Dr. Goske did not find each of the four trigger points to be bilateral; therefore, the ALJ's interpretation is reasonable. Even if there were 8 trigger points, however, this still would not fit the requirement for a diagnosis of fibromyalgia, according to the American College of Rheumatology. The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia. Report of the Multicenter Criteria Committee. Arthritis Rheum 1990; 33:160-72.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination at Step Two of the sequential evaluation that Plaintiff had a severe combination of medically determinable impairments, but that his fibromyalgia was not a medically determinable impairment. 404.1520(a)(4).

## C. Listings

Plaintiff next argues the ALJ did not evaluate his claim under the pertinent listings, those being 1.04 and 12.06, and provide a reasoned analytical discussion of the evidence as it related to the criteria of those listings as required by Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986). Plaintiff further argues that the substantial evidence of record supports a finding that his spinal impairments meet or equal Listing 1.04A. The Fourth Circuit addressed the issue in Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986), as follows:

> First, the Secretary is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of h[is] decision a statement of the reasons for that decision. The decision of the ALJ, which became the Secretary's decision as a result of the denial of review by the Appeals Council, fails to explain the reasons for the determination that Cook's arthritis did not meet or equal a listed impairment. The full explanation offered by the ALJ is as follows:
>
> > An examination and x-rays of the right hip and left shoulder in May 1983 established the existence of severe osteoarthritis with moderate to severe limitation of motion of the claimant's shoulders, elbows, wrists, knees, hips, neck, and back as well as markedly decreased grip. However, the claimant's arthritis impairment does not meet or equal in severity the requirements of Section 1.01 of Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or the other mandated criteria.
>
> This explanation is deficient for several reasons . . . . [The ALJ] also failed to compare Cook's symptoms to the requirements of any of the four listed impairments, except in a very summary way . . . .
>
> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence

> of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

Id. at 1172-1173. (Emphasis added). In the case at bar, the ALJ found:

> At step three of the sequential evaluation, I find that the claimant's medically determinable impairments, alone or in combination, do not meet or medically equal any listing in Appendix 1, Subpart P, Regulations No. 4 and No. 16. No physician has opined that the claimant's condition meets or equals any listing, and the state agency program physicians opined that it does not.

(R.42). The ALJ then discussed the "B" criteria of the Psychiatric Review Technique, noting in particular that he had found Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had had one documented episode of decompensation of extended duration. He also found the "C" criteria were not met. Based on the above, the undersigned finds the ALJ's explanation for finding Plaintiff did not meet Listing 12.06 (or any mental listing) sufficient. Based on the evidence of record, the undersigned also finds substantial evidence supports the ALJ's determination that Plaintiff did not meet or equal any mental listing.

The undersigned does not, however, find the ALJ's Step Three explanation regarding Plaintiff's physical impairments sufficient under Cook. In fact, the ALJ's analysis here contains less of an explanation than that in Cook. Listing 1.04A provides:

> *Disorders of the spine* (e.g., herniated nucleus pulposes, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord.

> With

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

24

Plaintiff has demonstrated at least some of the requirements of the Listing. The July 10, 2005, MRI of the lumbosacral spine showed that Plaintiff's severe scoliosis resulted in disc encroachment into the L2 neural foramen. Further, Plaintiff had at least some of the evidence of nerve root compression referred to in part A of the Listing. In this case, however, there is more to the issue than whether or not Plaintiff meets or equals Listing 1.04A. For example, 1.00L provides as follows:

> *Abnormal curvatures of the spine.* Abnormal curvatures of the spine (specifically, scoliosis, kyphosis and kyphoscoliosis) can result in impaired ambulation, but may also adversely affect functioning in body systems other than the musculoskeletal system. For example, an individual's ability to breathe may be affected; there may be cardiac difficulties . . . ; or there may be disfigurement resulting in withdrawal or isolation. When there is impaired ambulation, evaluation of equivalence may be made by reference to 14.09A. When the abnormal curvature of the spine results in symptoms related to fixation of the dorsolumbar or cervical spine, evaluation of equivalence may be made by reference to 14.09 B. When there is respiratory or cardiac involvement or an associated mental disorder, evaluation may be made under 3.00ff, 4.00ff, or 12.00ff, as appropriate. Other consequences should be evaluated according to the listing for the affected body system.

(Emphasis added).

Listing 1.00B1 provides that loss of function may be due to "miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits . . . ." 1.00B2 provides that "functional loss . . . is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment . . . ." Further, "[t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living . . . . Therefore, examples of ineffective ambulation include, but are not limited to . . . . the inability to walk a block at a reasonable pace on rough or uneven surfaces . . . ." Here there is at least one reference, from United Disability Services, to Plaintiff's being unable to walk at a reasonable pace just from his car to his work, for instance.

In November 2004, Dr. LeFever observed that Plaintiff moved slowly.

The undersigned cannot find, as Plaintiff argues, that his impairments do actually meet or equal 1.04A. Even if it were ultimately found, however, that Defendant did not meet a Listing, Defendant's argument itself points out the insufficiency of the ALJ's analysis. Under Cook, it is the ALJ, not the Commissioner, who "should have identified the relevant listed impairments [and] should then have compared each of the listed criteria to the evidence of [Plaintiff's] symptoms." The ALJ here did not identify any listings and did not compare any listing to Plaintiff's physical symptoms, despite evidence indicating Plaintiff met at least some of the criteria.

For all the above reasons, the undersigned finds that substantial evidence does not support the ALJ's determination that none of Plaintiff's impairments, alone or in combination, met or equaled a listing.

### D. Alcohol Abuse

Plaintiff next argues that "[w]ithout any supporting professional medical opinion, the ALJ, on his own accord, diagnosed plaintiff as an alcoholic and drug addict. Gilliland v. Heckler, 786 F.2d 178 (3rd Cir. 1986); Dennis v. Heckler, 756 F.2d 971 (3rd Cir. 1985)." Further, "[e]ven assuming, for sake of argument, Plaintiff suffers from alcoholism or is habituated to prescription drugs, the ALJ was required to follow the parameters set forth in SSR 82-60 if he felt drugs or alcoholism materially affected the issue of disability." Defendant argues that Plaintiff cannot be entitled to benefits if alcoholism or drug addiction is material to the determination that he is disabled. In fact, each argument is partially correct.

Under 20 CFR §§ 404.1535 and 416.935, the ALJ is to determine whether a claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability:

(a) *General.* If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

Here, the ALJ first determined Plaintiff was not disabled, and, second, found that "with or without" drug or alcohol dependence Plaintiff's "B" criteria of the mental health listings were the same. The ALJ was, in effect, stating that alcohol abuse or substance addiction was not material to a finding of disability in this matter. The undersigned finds this does not end the discussion, however. The ALJ did find that Plaintiff had a "medically determinable impairment" of "alcohol abuse," that was one of the impairments which, in combination, he considered "severe" (R. 41). The issue is, therefore, did the ALJ determine Plaintiff was not disabled in part due to his alcohol abuse and, if so, did that finding constitute reversible error?

20 C.F.R. 404.1508 provides:

Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms.

There is certainly evidence in this case that indicates Plaintiff could be considered an alcohol abuser/alcoholic. In February 2004, Plaintiff told his physical therapist he drank five to six beers per day. In November 2004, he told Dr. LeFever he drank four beers per day. In January 2005, he told Dr. LeFever he drank a couple of beers almost daily. He reported to Dr. Welko that he drank a 12-pack of beer per week. He told Dr. Buk-Bjerre he drank six to seven beers most days but that he did not see this as a problem. Yet none of Plaintiff's physicians or the psychologist diagnosed an alcohol problem. At the hearing, Plaintiff testified he started drinking alcohol at about age 12. At its heaviest, he would drink eight or ten beers in a day. Plaintiff testified that the day before the hearing he had two 24-ounce cans of beer (4 regular-size cans). The ALJ then asked him whether in March he was drinking six to seven beers a day, and Plaintiff said that "sounded about right." He

also testified he had been drinking about a six pack per day for the past two years. The ALJ asked Plaintiff if any doctor ever advised him not to drink alcohol when taking narcotic pain medication, and Plaintiff responded, "I'm sure they did." The ALJ asked him why he was so sure, and Plaintiff responded: "Because if they didn't, they'd get in trouble I would assume because they're a narcotic." He testified he probably knew "his whole life" that he should not drink while taking narcotics, but "it's not that easy just to sit it down, just to not do it. It's like smoking. You can quit smoking but it's not easy." He had never been to an AA meeting and no one had ever suggested he go.

The ALJ, although not expressly determining that alcohol abuse was material to his decision, clearly considered it significant in making his credibility determination, as follows:

> For reasons given below, I find that the subjective allegations in this case are not fully credible.
>
> The claimant has a significant alcohol abuse problem that he has been slow to acknowledge. He has a history of daily drinking for 30 years, and told Dr. Buk-Bjerre in March 2005 that although he drinks 6-7 beers per day on most days, "he does not see this as a problem" . . . . Actually, he testified that he does know that his daily drinking is a problem. He admitted that his pain management physician told him not to drink when taking narcotic pain medication, but that he does so anyway against medical advice, because it is "not easy" to abstain from alcohol. Clearly the claimant has an alcohol abuse problem He also smells strongly of cigarettes, despite his claim to have quit smoking in 2002 . . . . In fact, the odor of cigarettes on his person is so strong that Dr. Loftus and Dr. LeFever both specifically noted it in their progress notes . . . . <u>One reasonably questions, then, how much of his pain behavior results from actual pain, and how much from desire to continue use of addictive substances including narcotic medications.</u>

(Emphasis added). Again, there is no diagnosis of alcoholism, alcohol dependence or alcohol abuse in the record. While it may indeed be "reasonable" to question whether Plaintiff has an alcohol abuse problem, the undersigned finds it significant that Plaintiff has never denied his drinking, even where he must have known, from his testimony, that he could have been denied narcotics because of the admission. Instead, Plaintiff has been quite credible in admitting his drinking to his psychologist, to the doctors prescribing narcotics, and even to the ALJ deciding his disability claim.

The undersigned finds that, even though the ALJ did not find Plaintiff disabled and did not find alcohol abuse material to that disability, in a way, the ALJ has still made Plaintiff's alcohol use "material" to his determination of whether or not Plaintiff was disabled, by finding it made him less credible regarding his pain. Had Defendant lied to any of his providers about his alcohol use in order to continue receiving narcotics or lied about it in order to obtain benefits, this would be clearly a credibility issue. Without more, however, the undersigned agrees with Plaintiff that the ALJ has diagnosed him with alcohol abuse without any supporting medical opinion, and has also made the alcohol abuse material, at least in part, to his ultimate determination.

The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff had a medically determinable impairment of alcohol abuse or his finding that Plaintiff was not fully credible, in part due to alcohol abuse.

## E. Credibility

Plaintiff next argues the ALJ did not follow the mandates set forth in SSR 96-7p when determining the weight and credit to be given to subjective symptoms. Because the undersigned has already found substantial evidence does not support the ALJ's Step Two finding that Plaintiff had a medically-determinable impairment of alcohol abuse; his credibility determination, based, in large part, on that finding; or his finding at Step Three that Plaintiff did not meet or equal any listing, the undersigned also finds that substantial evidence does not support the ALJ's finding that Plaintiff's allegations regarding his pain and limitations were not fully credible.

## F. Hypothetical to the VE

Plaintiff next argues the ALJ relied upon an incomplete and inadequate hypothetical question as a basis for his denial. Because the undersigned has already found that substantial evidence does

not support the ALJ's determination that Plaintiff did not meet or equal any listing or his determination that Plaintiff's allegations regarding his pain and limitations were not fully credible, it follows that the undersigned cannot find that substantial evidence supports his reliance on his hypothetical to the VE.

### G.  Appeals Council Refusal to Reopen

Plaintiff finally argues that the Appeals Council erred by failing to reopen the claim at the review level for consideration of the new and material evidence in the form of the 2007 MRI showing significant and severe spinal impairments.  The undersigned agrees with Defendant that at the time the evidence was submitted to the administration, the Appeals Council had already denied Plaintiff's request for review, thus making the ALJ's decision the final decision of the Commissioner in this matter.  That "final decision" was made February 22, 2006.  The MRI at issue was dated June 22, 2007, almost a year and a half later.  Further, Dr. Douglas does not opine that the cervical spine studies were indicative of the severity of Plaintiff's spinal impairments during the relevant time period. Under the circumstances the undersigned therefore finds the Appeals Council did not err by failing to remand or reopen the claim.  To find otherwise would remove the finality of every case, mandating every case be reviewed or reopened whenever new evidence was presented.

### V.  Conclusion

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time from November 12, 2003, through the date of his decision.

### VI.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's

applications for SSI and DIB is not supported by substantial evidence, and I accordingly respectfully recommend Defendant's Motion for Summary Judgment [Docket Entry 23] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 19] be **GRANTED IN PART** by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _16_ day of July, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE